## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **AMANDA ROBINSON,** | : | **CIVIL ACTION NO. 1:10-CV-0876** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CATERPILLAR LOGISTICS** | : | |
| **SERVICES, INC.,** | : | |
| | : | |
| **Defendant** | : | |

### MEMORANDUM

Amanda Robinson ("Robinson") brings this action against Caterpillar

Logistics Services, Inc. ("Caterpillar") alleging that during her employment with

Caterpillar she was the recipient of unlawful sexual harassment, sex-discrimination

and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e *et seq.*, and the Pennsylvania Human Rights Act, 43 PA. CONS. STAT. § 951 *et*

*seq.*.  Presently before the court is Caterpillar's motion for summary judgment (Doc.

21).  For the reasons that follow, the motion with be granted.

**I.**   **Background**[1]

**A.**   **Employment Status**

On July 20, 2007, Caterpillar hired plaintiff Amanda Robinson as a part-time,

supplemental materials specialist at its York, Pennsylvania facility.  (Doc. 25 ¶ 5;

Doc. 28 ¶ 5).  Robinson's responsibilities as a materials specialist included moving

---

[1] In accordance with the standard of review for a motion for summary judgment, the court will present the facts in the light most favorable to Robinson, the nonmoving party.  See infra Part II.

parts from large shelving units and transporting them to the shipping dock.  (Doc. 25 ¶ 6; Doc. 28 ¶ 6).  During her employment Robinson uniformly met her production goals, and she never received reprimands or other disciplinary action. (Doc. 25 ¶ 15; Doc. 28 ¶ 15).

Josh Perry ("Perry"), the alleged harasser, began working for Caterpillar at the York facility on April 9, 2008, as a supplemental employee contracted through a third-party staffing agency.  (Doc. 30, Ex. 1 ¶ 8).  He continued as a supplemental employee through the third-party staffing agency until Caterpillar hired him as a full time regular employee on July 28, 2008.  (Doc. 30, Ex. 1 ¶ 9; see also Doc. 29, Ex. 2.B).

Supplemental employees of Caterpillar, like Robinson, lack the contractual protections of collective bargaining enjoyed by most regular, full-time employees.[2] Pursuant to a letter of agreement under the Collective Bargaining Agreement between the United Automobile Aerospace and Agricultural Implement Workers, Local Union 786 ("the Union"), and Caterpillar Inc. (which includes Caterpillar Logistics Services, Inc.), regular full-time employees retain contractual rights including the right not to be discharged without just cause.  (Doc. 25 ¶ 9; Doc. 28 ¶ 9).  In addition, the Union maintains the right to grieve and arbitrate disputes regarding whether a regular, full-time employee's termination was for just cause.

---

[2]  It is undisputed that Caterpillar is an "employer" as defined by Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-b, and the Pennsylvania Human Rights Act, 43 PA. CONS. STAT. § 954(b).  (Doc. 25 ¶ 2; Doc. 28 ¶ 2).

(Doc. 25 ¶¶ 8, 10; Doc. 28 ¶¶ 8, 10).  However, regular full-time employees are subject to a ninety (90) day probationary period during which time the grievance and arbitration provisions are inapplicable for claims of wrongful layoff or discharge. (Doc. 29, Ex. 2.A).

The letter of agreement also defines and severely limits the employment benefits of supplemental employees.  Supplemental employees are those employees "hired or contracted by the Company to work forty (40) or more hours per week on a temporary or indefinite basis," or "only within the Caterpillar Logistics Services facilities, employees hired or contracted by the Company to work less than forty (40) hours per week."  (Doc. 25 ¶ 8; Doc. 28 ¶ 8; Doc. 26, Ex. 1 at 12-13). Supplemental employees do not accrue any contractual rights, seniority rights or benefits and they "may be terminated at any time for any reason."  (Doc. 25 ¶ 9; Doc. 28 ¶ 9; Doc. 26, Ex. 1 at 14, 15).  Wrongful termination or discharge claims asserted by supplemental employees are not subject to the letter of agreement's grievance and arbitration provisions unless the discharge is based upon personal prejudice or union activity.  (Doc. 25 ¶ 10; Doc. 28 ¶ 10; Doc. 26, Ex. 1, at 15).  When a supplemental employee is hired as a regular full-time employee, the employee receives credit for all the days worked as a supplemental employee for purposes of completing the ninety (90) day probationary period of a regular, full-time employee. (See Doc. 30, Ex. 1 ¶ 6; see also Doc. 26, Ex. 1, at 15).

B.     **Caterpillar's Policies**

At all times relevant to the instant action, Caterpillar maintained a prohibited harassment policy, an equal employment opportunity policy, and a facility equal employment opportunity complaint procedure.  (Doc. 25 ¶ 16; Doc. 28 ¶ 16).  Caterpillar posted the policies at its York, Pennsylvania facility, and when she was hired, Robinson received copies of, and training on, the policies.  (Doc. 25 ¶¶ 17, 24; Doc. 28 ¶¶ 17, 24).

The harassment policy states, in pertinent part:

> Caterpillar will not tolerate any form of illegal harassment by or against its applicants and its employees in the course of their employment. . . .
> Illegal harassment may consist of unwelcome conduct, whether verbal, physical, or visual, that is based on a person's sex . . . . Harassment may include conduct, comments, gestures, pictures or teasing that belittles or shows hostility toward an individual because of her/his protected status.  Sexual harassment, for example, may include unwelcome sexual advances, requests for sexual favors, obscene language or gestures, joking, displaying obscene materials, patting, pinching or brushing against a person and other physical, verbal or visual conduct based on a person's sex.
> . . .
> Everyone at Caterpillar is prohibited from engaging in conduct that could be considered unlawful harassment or lead to a claim of unlawful harassment.

(Doc. 26, Ex. 3).  Employees who have witnessed or experienced harassment are instructed to immediately notify an area supervisor, department manager, facility EEO coordinator, human resources manager, or contact the corporate EEO manager.  (Id.)  The policy notes that violators of the policy are subject to disciplinary measures up to and including discharge.  (Id.)  The equal employment

4

policy states that "Caterpillar's policy is that all employment practices be conducted in such a manner as to not discriminate against any employee . . . due to a person's sex . . . and to provide a work environment which is free from any form of unlawful harassment." (Doc. 26, Ex. 4). Finally, the equal employment opportunity complaint procedure directs: "If an employee or applicant initiates questions, suggestions or complaints regarding equal employment matters, contact . . . , Fcaility EEO/AA Coordinator . . . to discuss complaints and allegations of discrimination." (Doc. 26, Ex. 5).

### C.   <u>The Harassment</u>

Robinson alleges that, beginning in late August 2008, her coworker Perry, also a materials specialist at the York facility, subjected her to sexual harassment. (Doc. 25 ¶ 27; Doc. 28 ¶ 27). Both Robinson and Perry reported directly to Leon Bellan ("Bellan"). (Doc. 25 ¶¶ 7, 28; Doc. 28 ¶¶ 7, 28).

During the first incident of harassment, Robinson alleges that Perry told her that his wife was interested in having a threesome with her. (Doc. 25 ¶ 30; Doc. 28 ¶ 30). Perry made no other statements, and Robinson did not respond to the comment. (Doc. 25 ¶ 30; Doc. 28 ¶ 30). Two or three days later, Perry made another comment about his wife's interest. (Doc. 25 ¶ 31; Doc. 28 ¶ 31). Although coworkers were present in the area, they were not close enough to hear the comment. (Doc. 25 ¶ 31; Doc. 28 ¶ 31). Again, Robinson did not respond, and Perry said nothing else. (Doc. 25 ¶ 31; Doc. 28 ¶ 31). Approximately five or six days after the second incident Perry purportedly told Robinson that his wife always tells him that "the size of his

penis is like an aerosol can." (Doc. 25 ¶ 32; Doc. 28 ¶ 32). Perry "shushed" Robinson to indicate she should not tell anyone. (Doc. 25 ¶ 32; Doc. 28 ¶ 32). Robinson made no comment, and Perry said nothing else. (Doc. 25 ¶ 32; Doc. 28 ¶ 32). Coworker Tiffany Smith ("Smith") was present during the incident, but neither Smith, nor Robinson reported the incident to management at that time. (Doc. 25 ¶ 32; Doc. 28 ¶ 32). At some point, Perry repeated his comment about the "aerosol can" to Robinson, this time in the presence of employees Nate Linton ("Linton") and Wes Jenkins ("Jenkins"). (Doc. 25 ¶ 33; Doc. 28 ¶ 33). No one reported the comment to management at that time. (Doc. 25 ¶ 33; Doc. 28 ¶ 33). About one week after the "threesome" and "aerosol can" comments Perry told Robinson that "he had an itch between his legs" and asked if Robinson would "itch it for him." (Doc. 25 ¶ 34; Doc. 28 ¶ 34). No one else was present for this incident. (Doc. 25 ¶ 33; Doc. 28 ¶ 33).

In addition to the comments, on three occasions in September 2008, Perry exposed himself to Robinson. On the first occasion, Perry exposed himself as he drove by Robinson on a forklift. (Doc. 25 ¶ 36; Doc. 28 ¶ 36). The two did not exchange words and no one else was present. (Doc. 25 ¶ 36; Doc. 28 ¶ 36). Approximately two or three days after the first incident, Perry again exposed himself to Robinson while he was sitting on a forklift. (Doc. 25 ¶ 37; Doc. 28 ¶ 37). Again the two did not exchange words, and although Linton and Jenkins were nearby, they did not witness Perry expose himself. (Doc. 25 ¶ 37; Doc. 28 ¶ 37). On Tuesday, September 23, 2008, Perry exposed himself a third time, this time

6

demanding that Robinson touch or grab him.  (Doc. 25 ¶ 38; Doc. 28 ¶ 38).  Robinson said nothing and left the area.  (Doc. 25 ¶ 38; Doc. 28 ¶ 38).

Robinson immediately reported the incident to her coworker Linton and asked that he contact a supervisor.  (Doc. 25 ¶ 39; Doc. 28 ¶ 39).  Upon being summoned by Linton, supervisor Richard Fry promptly came to the warehouse floor and escorted Robinson and Linton to an empty office.  (Doc. 25 ¶ 40; Doc. 28 ¶ 40).  Robinson's immediate supervisor, Bellan, arrived at the office a few minutes later.  (Doc. 25 ¶ 40; Doc. 28 ¶ 40).  Linton explained what Robinson told him, then returned to work.  (Doc. 25 ¶ 41; Doc. 28 ¶ 41).  Bellan then asked Robinson to explain what happened and Robinson described in detail all the incidents between her and Perry over the past month.  (Doc. 25 ¶ 41; Doc. 28 ¶ 41).  After listening to Robinson, Bellan summoned Perry to his office and indefinitely suspended him.  (Doc. 25 ¶ 44; Doc. 28 ¶ 44).  Bellan also emailed his manager, Roly Cruzet, detailing Robinson's complaint.  (Doc. 25 ¶ 48; Doc. 28 ¶ 48).  The following day, Cruzet shared the email with the Regional Human Resources Representative, Tracy Lenhart ("Lenhart"), who immediately commenced an investigation.  (Doc. 25 ¶¶ 25, 48-49; Doc. 28 ¶¶ 25, 48-49).

### D.   The Investigation and Termination

On September 24, 2008, Lenhart interviewed Robinson.  (Doc. 25 ¶ 51; Doc. 28 ¶ 51).  Robinson explained how Perry had exposed himself to her on more than one occasion, and reported Perry's statements about threesomes and the itch between his legs.  (Doc. 25 ¶ 51; Doc. 28 ¶ 51).  Robinson also claimed that Perry asked Linton

7

how he could get Robinson into bed, though Robinson admitted she was not present for that conversation. (Doc. 25 ¶ 51; Doc. 28 ¶ 51).

Lenhart interviewed Linton the following day. (Doc. 25 ¶ 53; Doc. 28 ¶ 53). Linton confirmed that Perry asked him how to get Robinson into bed and reported that, approximately two weeks prior to the September 23rd incident, Robinson told him that Perry had exposed himself to her. (Doc. 25 ¶ 53; Doc. 28 ¶ 53).

On September 29, 2008, Lenhart conducted a discipline review hearing to determine what disciplinary action Caterpillar would take against Perry. (Doc. 25 ¶ 54; Doc. 28 ¶ 54). Facility manager Kathy Ingram, Perry and two Union representatives were in attendance. (Doc. 25 ¶ 54; Doc. 28 ¶ 54). At the hearing, Perry denied exposing himself to Robinson on September 23rd, and denied making inappropriate statements, but admitted to exposing himself approximately two or three weeks prior, allegedly upon Robinson's request. (Doc. 25 ¶ 55; Doc. 28 ¶ 55). Perry claimed that he told Robinson that he had accidentally exposed himself to a neighbor about three weeks prior, and the day after telling her the story, Robinson asked Perry to show her his penis. (Doc. 25 ¶ 55; Doc. 28 ¶ 55). Perry claimed that Robinson made the request several times and even offered to provide her camera phone so that he could photograph his penis for her. (Doc. 25 ¶ 55; Doc. 28 ¶ 55). Perry also asserted that Robinson spoke about her sex life with coworkers. (Doc. 25 ¶ 55; Doc. 28 ¶ 55).

Following the hearing, Lenhart conducted interviews with Vicki Dettinger ("Dettinger") and Teresa Latchaw ("Latchaw"), coworkers of Perry and Robinson.

8

(Doc. 25 ¶¶ 56-58; Doc. 28 ¶¶ 56-58).  The parties dispute how the interview came about.  Caterpillar claims that after the hearing, a coworker approached Bellan and informed him that Dettinger and Latchaw had information relevant to the matter. (Doc. 25 ¶ 56; Doc. 26, Ex. 1 ¶ 25).  Robinson counters that with respect to Dettinger, Lenhart initiated discussion about the incident between Perry and Robinson during the course of an interview regarding a possible promotion.  (Doc. 28 ¶ 56; Doc. 29, Ex. 6, at 4).  Dettinger's interview with Lenhart occurred on September 30, 2008. (Doc. 25 ¶ 57; Doc. 28 ¶ 57).  Dettinger told Lenhart that about one month prior to the investigation, she heard Robinson ask Perry to expose himself.  (Doc. 25 ¶ 57; Doc. 28 ¶ 57).  Dettinger also informed Lenhart that Robinson engaged in conversations with her coworkers about her sex life, including participating in threesomes.  (Doc. 25 ¶ 57; Doc. 28 ¶ 57; see also Doc. 26, Ex. 4, at 5, 9).  On October 1, 2008, Lenhart interviewed Latchaw who stated she heard Perry and Robinson discuss penis size and that Robinson asked Perry to expose himself.  (Doc. 25 ¶ 58; Doc. 28 ¶ 58).  Latchaw also confirmed that Robinson discussed her sex life at work. (Doc. 25 ¶ 58; Doc. 28 ¶ 58).

Lenhart claims that on the basis of these interviews, she decided to interview a few more of Perry and Robinson's coworkers.  (Doc. 25 ¶ 59; Doc. 26, Ex. 1 ¶ 28). Lenhart then interviewed Tiffany Smith, who reported hearing Perry claim his wife nicknamed him "aerosol" due to his penis size, but stated that she was unaware of any specific inappropriate conduct by Perry or Robinson.  (Doc. 25 ¶ 60; Doc. 28 ¶ 60).  Finally, Lenhart interviewed Silvero "JR" Cruz, Wes Jenkins and Deb Fink,

none of whom were aware of any inappropriate conduct by Perry or Robinson. (Doc. 25 ¶ 61; Doc. 28 ¶ 61).

At the conclusion of the investigation, Lenhart determined that both Perry and Robinson had violated Caterpillar's prohibited harassment policy, and decided to discharge both of them.  (Doc. 25 ¶ 62; Doc. 28 ¶ 62; see also Doc. 26, Ex. 1 ¶ 32).

For Perry, this was not his first violation of the prohibited harassment policy. (Doc. 25 ¶ 64; Doc. 28 ¶ 64).  In August of 2008, a coworker of Perry's, Manuel Manning, complained that he heard that either Perry or another coworker had referred to him as a "nigger" at work.  (Doc. 25 ¶ 64; Doc. 28 ¶ 64; see also Doc. 29, Ex. 2.C).  Lenhart also conducted the investigation of that complaint, and Perry admitted to using the word while telling a story about something that happened outside of work.  (Doc. 25 ¶ 64; Doc. 28 ¶ 64).  However, Perry denied directing the racial epithet towards any other employee.  (Doc. 25 ¶ 64; Doc. 28 ¶ 64).  Two other employees confirmed that Perry used the racial slur, but Lenhart was unable to verify that it was directed towards another employee.  (Doc. 29, Ex. 2C).  Lenhart issued Perry a documented verbal warning for violating the prohibited harassment policy.  (Doc. 25 ¶ 64; Doc. 28 ¶ 64).  Lenhart claims that the decision to issue a warning was based on a belief that the Union would grieve any suspension or discharge of Perry for the incident and that any suspension or discharge would not likely be upheld in arbitration.  (Doc. 25 ¶ 65; Doc. 26, Ex. 1 ¶ 34).  Robinson denies that Lenhart's asserted basis for the warning was the true reason for issuing only a warning.  (Doc. 28 ¶ 65).

Lenhart discharged Robinson and Perry on or about October 6, 2008.  (Doc. 25 ¶ 63; Doc. 28 ¶ 63).  Lenhart informed Robinson that she was being terminated for violating the prohibited harassment policy.  (Doc. 25 ¶ 74; Doc. 28 ¶ 74).  Robinson denies that she violated the policy.  (Doc. 25 ¶ 62; Doc. 28 ¶ 62).

### E.    Procedural History

On November 17, 2008, Robinson filed an employment discrimination charge with the Pennsylvania Human Relations Commission and the Equal Employment Opportunity Commission.  (Doc. 1 ¶¶ 8, 9).  Robinson received Right to Sue Notices on December 16, 2009, and February 2, 2010, respectively.  (Id. ¶¶ 10, 11).  On April 23, 2010, Robinson filed her complaint (Doc. 1) alleging sexual harassment, sex-discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Pennsylvania Human Rights Act ("PHRA"), 43 Pa. Cons. Stat. § 951 et seq.  On May 17, 2011, Caterpillar filed a motion for summary judgment on all counts.  (Doc. 21).  Robinson filed a brief in opposition (Doc. 27) on June 7, 2011.  In her brief, Robinson withdrew her claim of sexual harassment, conceding that she cannot establish employer liability for sexual harassment.  (Id. at 12-13).  Caterpillar filed a reply on June 21, 2011.  (Doc. 30).  The motion has been fully briefed and is ripe for disposition.

## II.    Standard of Review

Through summary adjudication the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality.  See Fed. R. Civ. P. 56(a).  The

burden of proof is upon the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. Pappas v. City of Lebanon, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(a), (c), (e). Only if this threshold is met may the cause of action proceed. Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion

Robinson asserts claims of sex discrimination and retaliation pursuant to Title VII, 42 U.S.C. § 2000e et seq., and the PHRA, 43 PA. CONS. STAT. § 951 et seq.[3] The court will address each claim seriatim.

### A.      Discrimination on the Basis of Sex

Title VII of the Civil Rights Act makes it unlawful for an employer "to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1); see also 43 PA. CONS. STAT. § 955. Robinson claims that Caterpillar discriminated against her on the

---

[3] The court notes that the analysis under Title VII and the PHRA is identical. See Weston v. Pennsylvania, 251 F.3d 420, 426 n.3 (3d Cir. 2001).

basis of her sex by firing her after her first infraction of the prohibited harassment policy, whereas Perry, a male, was not terminated for his first violation of the policy.

Sex discrimination claims like Robinson's, in which she lacks direct evidence of discrimination, invoke the three-step, burden-shifting inquiry of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  At the first step, Robinson must establish a *prima facie* case of sex discrimination.  See Atkinson v. LaFayette Coll., 460 F.3d 447, 454 (3d Cir. 2006).  Once proved, the burden shifts to Caterpillar to advance a legitimate, nondiscriminatory reason for its actions.  Id. (citing McDonnell Douglas Corp., 411 U.S. at 802-03).  If Caterpillar advances legitimate non-discriminatory reasons, the burden shifts back to Robinson to prove that the nondiscriminatory explanation is, in actuality, a pretext for discrimination.  Id.

In order to establish a *prima facie* case of sex discrimination Robinson must show that: (1) she is a member of a protected class; (2) she was meeting Caterpillar's legitimate performance expectations; (3) she suffered an adverse employment action; and (4) Caterpillar treated similarly situated employees outside her protected class more favorably.  McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Only the fourth element is in dispute.

Caterpillar argues that Perry is not a similarly situated employee to Robinson because Perry was a regular full-time employee with rights under the Union Collective Bargaining Agreement, whereas Robinson was a supplemental employee with no rights under the Agreement.  (Doc. 24, at 19).  Caterpillar further asserts that Robinson has failed to identify any other similarly situated male employees

whom Caterpillar treated more favorably.  (Id.)  Robinson counters that she and

Perry are similarly situated because, at the time of her complaint, Perry was a

probationary employee entitled to the same rights as supplemental employees.

(Doc. 27, at 14).

Employees are considered to be similarly situated when they "deal[] with the

same supervisor, [are] subject to the same standards, and [engage] in similar

conduct without such differentiating or mitigating circumstances as would

distinguish their conduct or the employer's treatment of them."  Houston v. Easton

Area Sch. Dist., 355 Fed. App'x 651, 654 (3d Cir. 2009) (quoting Radue v. Kimberly-

Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000)) (quotations omitted).  When

considering the offenses "purported comparators must have committed offenses of

'comparable seriousness.'"  Opsatnik v. Norfolk Southern Corp., 335 Fed. App'x 220,

223 (3d Cir. 2009) (quoting Wright v. Murray Guard, Inc., 455 F.3d 702, 710 (6th Cir.

2006)).  The court finds that the violations of the harassment policy are not

comparable, and more importantly, Robinson and Perry are not similarly situated

due to Perry's status as a regular, full-time employee with rights under the Union

Collective Bargaining Agreement.

First, the prohibited harassment policy clearly states that violators of the

policy are subject to discipline "up to and including discharge." (Doc. 26, Ex. 2, at

29).  The policy does not mandate immediate termination on the first infraction.

Perry's first violation involved the use of a racial epithet, not directed at any

employee, in the course of telling a story.  That conduct is not sufficiently

14

comparable to the allegations of sexual harassment, sex talk and the physical exposure of genitalia, the activities that Perry and Robinson were found to have engaged in in violation of the prohibited harassment policy.  The nature of Perry's first violation and Robinson's purported violation are not of comparable seriousness to permit a comparison of the disciplinary action taken by Caterpillar.

More importantly, Robinson and Perry are not similarly situated because they were entitled to different rights regarding discipline and discharge.  Robinson claims that there is a factual dispute as to whether Perry had rights under the Union contract at the time of her complaint and at the time of his prior violation of the prohibited harassment policy.  She asserts, correctly, that his hire date as a regular, full-time employee was in late July 2008.  (Doc. 29, Ex. 2.B).  Robinson also correctly notes that regular full-time employees have probationary status for ninety (90) days and, during that period, have the same rights as supplemental employees like herself.  (Doc. 29, Ex. 2.A).  Where Robinson errs is in not considering Perry's employment with Caterpillar prior to being hired as a regular, full-time employee.

When a supplemental employee is hired as a regular full-time employee, the employee receives credit for the time worked as a supplemental employee towards the ninety (90) day probationary period.  (Doc. 26, Ex. 1 at 15-16).  The Declaration of David Stevens establishes that Perry, contracted through a third-party staffing agency, began working at the Caterpillar York facility on April 9, 2008.  (Doc. 30, Ex. 1 ¶ 8).  Perry was considered a supplemental employee at that time, and until his hire date of July 28, 2008, when he became a full-time, regular employee of

Caterpillar.  (Id. ¶ 9).  Therefore, pursuant to the letter agreement between

Caterpillar and the Union, Perry received credit towards his probationary period

for his time as a supplemental employee.  Having been employed as a supplemental

employee for over ninety (90) days, when Perry began his employment with

Caterpillar on July 28, 2008, he was entitled to all the rights and benefits under the

Union Collective Bargaining Agreement, including the right to be discharged only

for just cause, the right to a pre-discharge disciplinary hearing, the right to union

representation at the hearing, and the right to have the union grieve and arbitrate

on his behalf.  (See Doc. 26, Ex. 1 at 19-24).

        The court finds no factual dispute on Perry's employment status at the time

of the first complaint against Perry or Robinson's complaint.  Perry's status as a

regular full-time employee entitled him to certain rights with respect to disciplinary

proceedings under the Collective Bargaining Agreement to which Robinson as a

supplemental employee was not entitled.  Perry was not a similarly situated

employee, and Robinson has not demonstrate that a similarly situated male

employee was treated more favorably, therefore she cannot establish a *prima facie*

case of sex discrimination.[4]  See Blanding v. Pa. State Police, 12 F.3d 1303, 1309-10

(3d Cir. 1993) (noting that disciplinary records of white tenured troopers were not

relevant to former black trooper's race discrimination claim where trooper did not

---

        [4] To the extent Robinson claims that Caterpillar treated males other than
Perry more favorably than her (see Doc. 28 ¶ 69), Robinson has failed to put forth
any evidence that the other male employees were similarly situated.

claim that individual imposing penalty harbored racial bias against him, and

finding, moreover, that tenured state troopers were not similarly situated to

probationary trooper, as probationary troopers traditionally terminated more

readily than non-probationary troopers).  The court will grant Caterpillar's motion

for summary judgment on Robinson's sex discrimination claim.

### B.   Retaliation

Robinson's remaining claim is that Caterpillar retaliated against her for filing

a complaint alleging Perry sexually harassed her.  The same three-step burden

shifting analysis of McDonnell Douglas applies to her retaliation claim.  See Marra

v. Phila. Hous. Auth., 497 F.3d 286, 300 (3d Cir. 2007).  Robinson must first establish

a *prima facie* case of retaliation.  Id.  If proved, Caterpillar must come forth with a

legitimate non-retaliatory reason for her discharge.  Id.  Once Caterpillar proffers a

legitimate non-retaliatory reason, the burden shifts back to Robinson to put forth

evidence showing the stated reason to be fabricated or pretextual.  Id.

To prove a *prima facie* case of retaliation Robinson must show that: (1) she

engaged in a protected activity; (2) her employer took a materially adverse

employment action against her; and (3) a causal connection between the protected

activity and the adverse employment action.  Burlington N. and Santa Fe Ry. Co. v.

White, 548 U.S. 53, 60, 68 (2006).  Caterpillar contends that Robinson cannot

establish a causal connection between the filing of her complaint and her

termination, asserting that Lenhart's discovery of Robinson's own violation of the

17

prohibited harassment policy broke any causal link that might otherwise be inferred. (Doc. 24, at 23-25).

Evidence of causation can be any evidence "gleaned from the record as a whole from which causation can be inferred." <u>Farrell v. Planters Lifesavers Co.</u>, 206 F.3d 271, 281 (3d Cir. 2000). For example, a causal connection also may be established by a showing that the employer provided inconsistent reasons for terminating the employee. <u>Id.</u> (citing <u>Waddell v. Small Tube Prods., Inc.</u>, 799 F.2d 69, 73 (3d Cir. 1986)). Additionally, in some circumstances, the temporal proximity between a protected activity and an adverse employment action may be sufficient to establish a causal connection for purposes of a claim of retaliation. <u>See id.</u> at 279-80. The Third Circuit cautions, however, that "each case must be considered with a careful eye to the specific facts and circumstances encountered." <u>Id.</u> at 279 n.5.

Robinson contends that she can establish a causal link between the filing of her complaint and her termination on the basis of: (1) the proximity in time between her complaint and her termination—approximately two weeks; (2) the deposition testimony of Linton that Caterpillar was known to target employees who file complaints; (3) the lack of any complaints from coworkers regarding Robinson's alleged conduct; (4) the fact that Robinson was not given the opportunity to address the allegations that she violated the harassment policy; and (5) the report of several employees that Linton also engaged in conduct similar to Robinson's yet he was not investigated or terminated. (Doc. 27, at 22-23). Moreover, Robinson claims that the

conduct for which she was fired did not occur after the filing of her complaint, but prior to it, thus leaving the causal chain unbroken.  (Id. at 23-24).

In the instant matter, timing alone is insufficient to raise an inference of retaliation given Caterpillar's discovery of Robinson's purported improprieties.  Nor has Caterpillar given inconsistent reasons for terminating Robinson.  The reason asserted has remained the same: Robinson violated the prohibited harassment policy.  However, the remaining reasons put forth by Robinson, when taken together, may be sufficient to establish a causal link.

Assuming, without deciding, that Robinson's asserted reasons do establish causation and thus a *prima facie* case of retaliation, the court finds that Robinson cannot meet her burden of establishing that Caterpillar's reason for her discharge—her violation of the prohibited harassment policy—is a pretext for discrimination.  To establish pretext, Robinson must point to direct or circumstantial evidence from which a reasonable factfinder could either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe than an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).  Simply showing that Caterpillar's decision was wrong or mistaken is insufficient to establish pretext.  Id. at 756. "[T]he factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Id.  Thus, Robinson must show "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder *could* rationally find them unworthy of credence, and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." Id. (internal citations and quotations omitted). In other words, Caterpillar's proffered reason must be so plainly wrong that it cannot have been the true reason for Robinson's discharge. See Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1109 (3d Cir. 1997).

Robinson denies that she engaged in any of the conduct in question and asserts that Caterpillar's conclusion that she violated the prohibited harassment policy was unreasonable and in bad faith. (Doc. 27, at 18). Robinson insists that pursuant to caterpillar's policy, conduct must be "unwelcome." Thus, even if Robinson did engage in crude sex talk and request that Perry expose himself, (1) Perry was not offended by the conduct, (2) her requests that Perry reveal himself were in the context of a joke in which everyone was participating, and (3) no one filed a complaint. (Id. at 18-19). The argument is unavailing. First, Robinson's denial that she engaged in conduct that violated the policy and her own personal belief that the reason for her termination was retaliation for filing a complaint are insufficient to create a genuine issue of fact for purposes of summary judgment. Ade v. KidsPeace Corp., 401 Fed. App'x 697, 703 (3d Cir. 2010); see also Naber v. Dover Healthcare Assocs., Inc., 763 F. Supp. 2d 622, 634 (D. Del. 2011) (citing Brown v. Boeing Co., 468 F. Supp. 2d 729, 737 (E.D. Pa. 2007)). Second, Robinson's argument that the conduct, if true, did not amount to harassment under the policy, lacks support in the policy itself. The Caterpillar harassment policy prohibits

20

"conduct that *could be* considered unlawful harassment or *lead to* a claim of unlawful harassment," and may include "joking." (Doc. 26, Ex. 3 (emphasis added)). That asking another employee to expose himself, and talking about one's sex life in the workplace, could be considered or lead to a claim of unlawful harassment is beyond dispute. Even if Robinson's denial of the conduct is true, it was not unreasonable for Lenhart to conclude that a violation of the policy occurred, given the interviews with Perry, Dettinger, and Latchaw, all of whom reported that Robinson asked Perry to expose himself and discussed her intimate relations with coworkers.

Robinson next asserts that Lenhart targeted her and immediately began investigating her after she made the complaint against Perry. (Doc. 27, at 19). Robinson points to the allegedly glaring discrepancy between Lenhart and Dettinger's versions of how Lenhart came to interview Dettinger about Robinson and Perry. Robinson contends that an inference can be drawn that Lenhart intended to investigate and discipline Robinson because Lenhart continued to investigate the matter after Perry admitted at his disciplinary hearing that he exposed himself. (Doc. 27, at 25). Neither the factual discrepancies in testimony, nor the continued investigation support Robinson's position that a discriminatory reason motivated Lenhart's decision to terminate her.

Although it is disputed how Dettinger's interview came about, it is undisputed that Lenhart's inquiry occurred subsequent to the disciplinary hearing in which Perry accused Robinson of asking him to expose himself and discussing

21

her sex life with coworkers.  Robinson can point to no evidence indicating that
Lenhart began an investigation of her *prior to* the allegations of her misconduct.
Moreover, Dettinger is not the only employee who Lenhart interviewed that
reported Robinson's behavior.  Latchaw also reported in an interview that she had
overheard Perry and Robinson discuss penis size, heard Robinson ask Perry to
expose himself, and heard Robinson discuss with other employees the details of her
sexual encounters.  The record lacks any indication that Lenhart, without any
prompting, instigated discussions with Latchaw.  Rather, Bellan testified at his
deposition that Latchaw approached him and said she had information relevant to
the investigation, and Bellan passed that information on to Lenhart who later
conducted an interview with Latchaw.  (See Doc. 29, Ex. 4, at 5-6).

Lenhart's continued investigation after Perry's admission also fails to raise
any inference of pretext.  Perry admitted to exposing himself at his disciplinary
hearing, but he also asserted that Robinson requested he do so and that she
discussed her sexual relations with other employees.  Robinson claims that once
Perry admitted to exposing himself, the investigation should have ceased because
"[i]t stands to reason that . . . there would have been nothing left to investigate if
there was no intent to investigate Robinson."  (Doc. 27, at 25).  It is confounding to
the court why Lenhart should have ignored Perry's explanation implicating
Robinson once Perry admitted to exposing himself.  Such a response may have
subjected Caterpillar to a sex discrimination claim by Perry.  No reasonable jury
could infer that Lenhart intended to discriminate against Robinson by continuing

22

her investigation after Robinson was implicated in the very behavior of which she complained.

The Eighth Circuit faced a similar situation in <u>Alvarez v. Des Moines Bolt Supply Co.</u>, 626 F.3d 410 (8th Cir. 2010). In <u>Alvarez</u>, the plaintiff made a complaint to management that a coworker often smacked her behind, whispered sexual slurs in her ear and made sexual advances towards her. <u>Id.</u> at 414. During the course of the company's investigation of the allegations, other employees reported that Alvarez and the coworker against whom she filed a complaint had engaged in inappropriate actions toward each other, including sharing dirty jokes and making random sexual comments and gestures. <u>Id.</u> The investigation report concluded that both employees engaged in conduct prohibited by the company's policy, and as a result, the company suspended both Alvarez and her alleged harasser for five days. <u>Id.</u> Alvarez filed suit claiming sex discrimination and retaliation. With respect to Alvarez's retaliation claim, the Eighth Circuit explained that, '[i]f the employer takes an adverse action based on a good faith belief that an employee engaged in misconduct, then the employer has acted because of perceived misconduct, not because of protected status or activity.' <u>Id.</u> at 416 (quoting <u>Richey v. City of Independence</u>, 540 F.3d 779, 784 (8th Cir. 2008)). The court further explained that simply because "Alvarez's complaint was the genesis of the investigation that led to her suspension does not, in and of itself, tend to show that she was a victim of unlawful retaliation." <u>Id.</u> at 417. Similarly here, the fact that Robinson's complaint "was the genesis of the investigation that led to her

23

[termination]" does not, alone, tend to show that she was a victim of unlawful

retaliation.  Id.  There is simply nothing implausible or inconsistent with continuing

the investigation based upon the information received in the course of the

investigation.

Robinson next points to the deposition testimony of Linton, who claims that

employees at Caterpillar know not to complain to management because those who

complain will be watched closely and disciplined.  (Doc. 29, Ex. 7, at 3).  However,

conclusory statements regarding discriminatory motive are insufficient to satisfy

the plaintiff's burden at the summary judgment stage.  See Lacy v. Nat'l R.R.

Passenger Corp., 254 Fed. App'x 934, 937 (3d Cir. 2007) (coworker's affidavit setting

forth conclusory statements of discriminatory motive that did not refer to specific

instances of harassment deemed insufficient to withstand summary judgment); see

also Blair v. Scott Speciality Gases, 283 F.3d 595, 608 (3d Cir. 2002) (conclusory, self-

serving affidavits lacking in specific facts fail to satisfy party's burden).[5]

Finally, the court fails to see how Lenhart's decision to terminate Robinson

without interviewing her a second time is indicative of discriminatory animus.

Lenhart's determination that Robinson violated the prohibited harassment policy

was corroborated by Perry, Dettinger and Latchaw.  See Fuentes, 32 F.3d at 756

(stating that the issue is "whether discriminatory animus motivated the employer,

not whether the employer is wise, shrewd, prudent, or competent"); see also

---

[5]  Of note, Linton was the one who initially went to management on
Robinson's behalf.  (Doc. 25 ¶ 39; Doc. 28 ¶ 39).

<u>McCormick v. Allegheny Valley Sch.</u>, 2008 WL 355617, at * 16 (E.D. Pa. Feb. 6, 2008)

(stating that when employer relies on statements of coworkers in making

termination decision, employee cannot establish pretext by challenging

truthfullness of statements).  Robinson admitted at her deposition that she did not

know of any reason or motive that Dettinger or Latchaw would have to lie about

her.  (Doc. 26, Ex. 2, at 12).  The record simply does not support a reasonable

inference that Caterpillar acted with an intent to retaliate against Robinson for

filing a complaint.  The court will grant Caterpillar's motion for summary judgment

on the retaliation claim.

## IV.   <u>Conclusion</u>

For the above-stated reasons, the court with grant Caterpillar's motion for

summary judgment on all counts.  An appropriate order follows.


   S/ Christopher C. Conner
CHRISTOPHER C. CONNER
United States District Judge


Dated:       January 26, 2012

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **AMANDA ROBINSON,** | : | **CIVIL ACTION NO. 1:10-CV-0876** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **CATERPILLAR LOGISTICS** | : | |
| **SERVICES, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## <u>ORDER</u>

AND NOW, this 26th day of January, 2012, upon consideration of the motion

for summary judgment (Doc. 21), filed by Caterpillar Logistics Services, Inc., and

for the reasons set forth in the accompanying memorandum, it is hereby

ORDERED that:

1. The motion for summary judgment (Doc. 21) is GRANTED.

2. The Clerk of Court is directed to enter JUDGMENT in favor of
   Caterpillar Logistics Services, Inc. on all counts.

3. The Clerk of Court is directed to CLOSE the case.

                                                      _S/ Christopher C. Conner_
                                                    CHRISTOPHER C. CONNER
                                                    United States District Judge